and the Times will be as allotted to counsel. The first case today is 22-1867, the United States v. Grace Katana. Counsel? Good morning. May it please the Court. My name is Daniel Smith. If the Court would allow me to reserve two minutes for rebuttal. You may. Thank you, Your Honor. The central issue in this appeal is a fairly straightforward one. The question is whether the indictment in this case was constructively amended by the district court's instructions as well as by the government's arguments to the jury. And it's set forth in the briefs, it's in the appendix, but it really bears repeating. The indictment in this case charged Mr. Katana with conspiring to interfere with interstate commerce, quote, by the robbery of person number one, an individual residing in Rockland, Massachusetts, who was engaged in the sale of custom glass smoking devices. Mr. Clowardy, do I correctly understand that it's undisputed that person number one is Joseph Wilson? It is, it is, Your Honor. And in fact, that same quotation with Mr. Wilson's name was inserted in the summary of the case to the jury panel at the outset. It was a joint statement of the case. There was never a dispute that Mr. Wilson is person number one. Thank you, that's helpful. Counsel, can I ask you, is the, in your views, the identity of the victim an element of the offense for Hobbs robbery? I would say the identity of the victim is not an element. However, the robbery is an element. And we're talking about a conspiracy. So the nature of the robbery, and I think I addressed this in the brief, the government says that I don't think the government has to identify the victim in the indictment, but elected to do so in this case. And that's why this case matches up, in our, my opinion, matters is your opinion, of course, with the Sterone case where the government elected to choose a specific portion of the element of the interstate commerce element. And by making that decision, put the defendant on notice that that's what this case was going to be about. That's the point of the whole doctrine, the Fifth Amendment, that informs the constructive amendment doctrine. Who's the victim of a robbery in the case of a business owned by a corporation? Is it the individual who is accosted, or is it the owner of the business? Or is it both? I think it could be both. Victim is not really a term that's necessary. There need not be a conclusion on who the victim is. But the target can be a business. Certainly the case law has developed, although the statute speaks in terms of a person. I don't think there's a dispute, and we don't dispute that the government could have alleged that the business was a target. There needs to be, in order for it to distinguish it from a theft, in order to make it a robbery, there must be a person present. So either a person, the robbery can be from the person, in other words, taking something right off someone's person, or a person who was present at the time of the robbery. Could that business be a sole proprietorship? I believe it could be. Could it be a partnership? I believe it could be. Could it be a partner in a partnership? Could the business be a partner in the partnership? Could the victim? Sure. Thank you. Counsel, so can I ask you, is one of the key issues in the case, then, whether a robbery of Mr. Wilson is the same as a robbery of his home business? Is it your position that it's just not? Well, it's not what was charged here. But let me just ask you, if we read, we are supposed to read the indictment in a common sense fashion, and you quote in your brief often a robbery of person number one, but then of course the words that come right afterwards is somebody who is operating a glassware business. So why, in a common sense reading of the indictment, was your client really not on notice that the robbery or the victim of the robbery was Mr. Wilson's business? Well, I don't think it was. The indictment does not allege that Mr. Wilson's business operates at the French Road address. It simply says that he is a person engaged in the sale of custom glass smoking devices. So it did not specifically identify where that business was. It didn't need to do so. Do you have any case that suggests that in order to give fair notice to the defendant, that level of detail needs to be in the indictment? I would argue that it did not need to do so. In other words, the indictment could have simply charged Mr. Katana with conspiring to participate in a robbery. I think there may be a little bit of a notice issue if there's not some detail provided. But there is no requirement, and I think the case law is clear, there's no requirement that the target of the robbery be specifically identified or that the individual who was present at the time of the robbery be identified. But once the government elects to do so, and this is where Cerrone comes right into play, then they're bound by that. And that's the notice that was provided to Mr. Katana. And his defense was hinged entirely on that. So your position, as I understand it, is that the indictment charges that Wilson, person number one, is the target, and the language about the business is merely descriptive of who Mr. Wilson is. Well, I think a little more than descriptive. It is necessary that the government establish an interstate commerce impact. And I think that the common natural reading of the indictment is that's the purpose of that clause. The purpose of the clause is that he's an individual who is engaged in interstate commerce. And so that is an element, and the government has to allege that. Well, it certainly accomplishes that, but how would we know whether the grand jury was limited to that information with respect only to the interstate commerce provision? How would we know? I mean, as Judge Rickleman says, a common sense reading suggests that he was in business. How would we know that the grand jury wasn't given that same information? Well, I guess I would argue that I don't believe a common sense reading of that indictment indicates that the business was the target of the robbery. The common sense reading is that the target of the robbery was a person, number one, and an individual. But you said a sole proprietorship or a partner could be the victim. Could be, certainly. But it was not identified as a sole proprietorship or that his business. And this is why the judge's instruction, the district court's instruction is so critical. Counsel, before you go to the instruction, I'm sorry. Can I just ask you again, do you have any case that stands for the proposition that a robbery of an individual is a different crime than a robbery of that individual's home business? I do not. I do not. But I think the body of case law shows that a business can be a target of a individual can be a target of a Hobbs Act robbery. But there are two different entities. And the court in its instruction described the agreement that, according to the court, was specified in the indictment as an agreement to commit a robbery of Mr. Wilson's property, which is different than what was specified in the indictment, which is a robbery of Mr. Wilson. But don't you need, and tell me if I'm wrong, don't you need to show that essentially a different crime was charged to win your constructive amendment theory? And so you have to show there, don't you need to show that there are two different crimes, robbing Mr. Wilson versus robbing Mr. Wilson's home business? Well, I do think they're different offenses. I know the government has leaned hard into some of the language that sort of says that it's not a constructive amendment if it's the same offense. I would submit that that's not really what the court, this court, has ruled. Sterone itself was the same offense. It was a Hobbs Act offense. It was simply that the limiting language in the indictment defined that offense a specific way. And our position here is that the offense that was defined is the robbery of Mr. Wilson, not a robbery of Mr. Wilson's business, not a robbery of some other individual, not a robbery other than of Mr. Wilson individually. So while I don't have a case that I think delineates that, I think the case law is pretty clear that the government could have, and often does, allege a business as a target, or a business or an individual as a target. And while I appreciate, Judge Howard, your point that a sole proprietorship could be a target, that is still different than an individual. And Mr. Katana's defense, I recognize I'm running a little short of time, but I want to make sure, and I also understand, I know the court's familiar with the fact that, well, we think this is a constructive amendment, and the case ends there. As a variance, Mr. Katana's, the primary focus of the argument on variance is the prejudice that Mr. Katana suffered. And that prejudice was significant. He focused his defense on the fact, remember, the government didn't have to prove that Mr. Wilson was there. They simply had to prove that the defendants, or Mr. Katana specifically, but the conspiracy intended to rob Mr. Wilson individually. And so the focus was on, of the defense, was what did Mr. Katana know about Mr. Wilson, and where he was. But counsel, can I ask you, is that really correct? Because I think there were very good arguments made during the trial in his defense, saying that the jury could only convict if they were certain that Mr. Katana believed someone would be in the house at the time of the robbery. So clearly the defense also focused on that, not just whether Mr. Wilson would be there, but whether somebody would be there, and argued that the government hadn't proved that Mr. Katana expected anyone to be at the house. So where really is the prejudice? Well, I think it's significant in a couple spots. First, in opening argument, it started with talking about someone, but then focused specifically on the fact that Mr. Wilson was the target. That's what was argued in opening argument. By the time we got to closing, then certainly at closing, the court had already instructed the jury, and we were forced to rewrite that closing to sort of incorporate that other argument, whether someone else was in the house. The prejudice was really structured, you can see, in the cross-examinations of the witnesses. Ms. Connors is only asked, she's not asked about what she may have heard in the house, or the music. I recognize the government put evidence in on that, was focused on where was Mr. Wilson. Mr. Wilson himself focused on that, and not only where was he, but was he posting? And that mattered, because it matters to what Mr. Katana knows at the time. The same is true of the questioning of Ms. O'Brien as well, the focus in particular. And then Agent Ventitullo was specific, there was a specific series of questions. Not only was he questioned specifically about how the investigation on where was that person, then there's a break, and then counsel came back and argued it again, only to underline to the jury about what was said, about where Mr. Wilson was, and what the defendant may or may not have known about where he was. So it's an enormous amount of prejudice, otherwise the defense would have to have been much more targeted on, first of all, whether that would have even mattered, because if there's evidence that was under the government's theory, why are we focusing so much on what we knew about Mr. Wilson? I suppose that would be part of it, but you'd still have to address where, I recognize I'm out of time, but addressing, there was no opportunity, I shouldn't say opportunity, but there was not sufficient notice to address where Ms. O'Brien was, or who else was in the house. I don't think the court needs to reach that question, because we think it's a constructive amendment, but if you do, I think there's ample evidence of prejudice. Judge Salley, did you have anything further? No. Thank you. Your Honors, may I please the court, Randall Crum on behalf of the government. Your Honors, I think this case begins and ends with the plain terms of the indictment's language and the reasonable inferences that you can draw from it. The nature of this crime and the central aspect was an impact on interstate commerce by robbery, and the way the robbery was described was the robbery involving an individual at a particular address and involving a particular number of people. No, no, no, no, no, no, no, Mr. Crum. The word involving wasn't there. It was the robbery of person number one. Yes, sir. And at the very least, the government has used pretty awkward language in this indictment. Your Honor, we acknowledge the indictment could have been clearer here, but ultimately, whether it fairly covers the crime that was in fact the defendant was convicted of, and we think it does, which we point out the robbery of does not automatically mean a robbery from, and in fact, it's in common parlance to say that a business has been robbed. It's a robbery of that business, but it doesn't tell you necessarily anything or doesn't one expect it to tell you anything about who was there. And as has been discussed, this whole proprietorship and individually owned business is a business, and we think by the fact that that language was included regarding the business, which can't be surplused, which is essential to the nature of the crime, the fair reading is that it targeted that business, putting us in the category of Well, my fair reading or my initial reading of that language was that it was included to cover the interstate commerce element, not necessarily in modification of the nature of the crime, as you now say. Well, Your Honor, I think that, again, you read the phrase as a whole, it's interstate, in fact, that interstate commerce by the robbery of person one who was engaged in interstate commerce, engaged in a particular business activity, the logical reading of that is that he was targeted in that capacity, that he was, the object of the robbery were those assets, was the assets of the business, and I think if you think of it in sort of a common sense reading, if I was to tell you that a person named Joe Wilson down the street who runs a business that sells glassware in interstate commerce was robbed, your assumption is going to be that they robbed his business. They took the business assets. What was the evidence about what was taken? Well, the evidence, as we point out in the sufficiency argument, was that they were brought a dolly, that they were sort of appeared to be coming to take the business inventory that was in this house, which was contained in cabinets that would have been known to anybody who conspired or intended to take any non-business assets. There's no evidence that there was. I mean, what we have is essentially, you know, defendants, co-defendants speak in code, but it's clear that they researched what they were doing well in advance. They set Mr. Katana down ahead to scope out the location. They drove 60 miles with a dolly in their car and that they were planning to do something that they thought would be worth their while in doing so, and I think the reasonable inference is that they were, and we also know that the business was advertised on social media, that Mr. Wilson occasionally let people visit in his own home to see how he kept his inventory. And one could reasonably argue, infer, we asked the jury to infer that they understood what they were doing. They were going down there to get the assets of the business and there was no indication they were after, you know, his wallet, his watch, his jewelry or anything else. Counsel, you said before that there was an address in the indictment, but there isn't an address, right? It's just Rockland, Massachusetts. It's just Rockland, Massachusetts. Location. I misspoken. You're driving an address. But I think the point would suggest that this, in our reading, the sort of the natural reading, when you include that information about his, what his business was, in a crime that depends upon an interstate commerce nexus, you're pointing to essentially the target. The nature of the assets that were targeted, because that's the way the government would show an impact in interstate commerce, and they were showing that these were what, it was the business he was engaged in. I think it is a fair reading, even though it doesn't say his business, but engaged in the sale of fairly implies a business person and that the target was his business operation and his business assets. And from that point, I think it's, it fairly states the proposition that they were targeting his business and it wasn't identifying him as anything more than the owner of those assets and not attempting to say anything, which as defendants argue, we didn't need to say anything about who would actually be placed in fear or who might be present. Counsel, if you wouldn't mind, I would like to true to form ask an off-topic question. Some time ago, my recollection is that the government argued in a case that Sterone really should be thought of, given subsequent case law in the circuit court, should be thought of as a variance case, not a constructive amendment case. And setting aside the second circuit sort of core conduct view, what's the government's position on that now, given the intervening case law? I won't say that. I know who said that or under what circumstances, so I don't want to agree or disagree with what was said under the circuit court, but I do think that there is a difference and constructive amendment and it can sometimes be hard to draw the line. And I view Sterone as essentially being at such a far extreme of sort of a factual difference that effectively it has become a constructive amendment. It's a different crime. And that's where that core conduct or essential elements kind of analysis is important. There, as the court knows, but I won't go at length, but there the difference was between an interference by interfering with importation of cements and an interference years down the road in terms of the steel production result from the use of that very same cement. Reasonably enough, the defendant would not have been unnoticed if they had to prepare for a defense involving the possible. Okay. That sounds like variance to me, not constructive amendment. But how do you account for our cases that suggest that you really do have to show a different element in order for it to be a constructive amendment? To be honest, I find it somewhat difficult to reconcile. Sterone does on its face appear like a very extreme variance case that certainly reaches a point where sort of due process reasons the court felt it was essentially required to treat it as a different crime. Okay. So it appears on its face, but what's your view of what it actually is? I'm afraid I can't answer without, because again, my reading of it is that it reads like a variance case at a very extreme edge. But again, you're honor's point, the question is essentially to this court's cases is a different crime. And I guess one way to reconcile is that at some point the facts become so completely and fundamentally divergent that it's a different crime even though it happens to be under the same statutory heading. But that's probably the best I can do without, you know, researching the issue a little bit more. Well, I'm sure I didn't knock you off track. Counsel, can I ask you a question? One of the other arguments that defense counsel has made was that there was really no proof, actually, that Mr. Katana knew that anybody was going to be in the home. And in fact, the evidence showed that there was great effort made to plan the crime for a time when there was no evidence, which did seem quite relevant, I think, to the case at hand. One point that I think is fair to make is I think an argument on that sufficiency argument has been waived because he concedes in his reply brief that his sufficiency claim is more narrow, which is aimed at was there sufficient evidence to show that the co-conspirators believed, conspired to rob it when Mr. Wilson was not present? Was there sufficient evidence with respect to Mr. Wilson specifically? We argued in our responsive brief that we don't, you know, that is sort of predicated on his constructive amendment argument. In his reply brief, he agreed. So I would say, just as a preface, that I think that broader sufficiency argument is not in the case right now, but to respond to it into the Acosta case. I think the real difference is did they contemplate in this case that the likelihood that someone could still be there and decide to go forth regardless? And we point in our case, two Second Circuit cases, which is where Acosta comes from, that point out where the likelihood that there is a back-up plan to use force if necessary, even if they hope not to, the evidence will be found sufficient. In those cases, one, they would plan to use an insider in deception. They hoped to not have to use force, but they were ready to go in. I read those cases, and they did seem factually very different. And I think the key way in which they seemed different was that the crimes there were planned, and you can tell me if I'm wrong, but in public settings where it was reasonably foreseeable, you know, common sense that there would probably be people in the public who might walk by while the crime was being committed, and therefore, they could be potentially harmed. And Acosta seems much more relevant because it concerns a crime from a person's private home, where there's no reason to think anybody else is going to be there. So I didn't find those cases to be particularly persuasive, to be honest. Well, yes. So I think the key difference here is there was some indication. It was clear that they was there. Is there anything other than the gun is my question for you? Well, there's also, you know, I think there's the fact that one of the co-conspirators says, I'm going in anyway. Seems, you know, unconcerned. No, he said, I'm going in first anyway. There's also the fact that you, I think we pointed out that two of the people who were actually going in were concerned about being seen in the facility. But I think there's also the information that there was a car in the driveway, that the defendants to the last moment were not sure. And they say that. I mean, they say we're trying, you know, one of the last conversations is we're trying to check on that. You know, Katana's going to call his guy. Doesn't that show that they're, again, making efforts to make sure they don't go in when anybody's present? But the point is that they went forward without, there was no, there's no indication that they were ever received confirmation that no one was present. I mean, what I think the record fairly shows is that they had hopes of going in when no one was present. So they were seeking to iron that out. But another point I think made in the defense by the government or at its closing argument is that you could have find the conspiracy happened at an earlier point as well. We did argue to the jury that no later than the point where Katana and Johnson were talking and he says, you know, so it's a go and he says yes. And, you know, he talks to I think Johnson the next day and he says, so we're in. All right. But they were in agreement to go in. And this is before there's talk of his schedule. I mean, that was, they could have found that there was an agreement to go forward and that it really didn't depend upon whether anybody was there. But I think the key part, you know, going later again is I don't think you can... On that point, though, to prove a conspiracy here, you have to prove an overt act or not? No. So I think the key part here is I think fairly red. It shows effort to find out if anybody would find out what they would be encountering. So they know what they were going to be getting into. But there was indications. They saw a car in the driveway. There was some indication that they might have heard music. There was a package sitting there. There was things that could have certainly raised, you know, reasonably the jury could have found raised in their minds the potential that somebody was there and that they were still seeking to iron it out, but that they nonetheless were going to go forward in any event. And I think in absence, something clearer that they essentially were only going into an empty house, which I don't think the record supports. I think there was enough to find. They were intending to go in regardless. They were prepared, you know, with a gun and prepared to deal with whatever they were going to deal with. I guess, again, my question is once they saw the car in the driveway and the evidence seems to show they paused and were trying to figure out if they were going to go forward, what evidence is there to suggest they were going to go forward regardless other than the gun? Is there anything else you can point to for me? That they continued to purchase items at the store. There was no they didn't stop. I mean, my understanding, the sequence of events is there's the conversation about, you know, that he's going to try to find out. But at this point, people are going to the store and buying a crowbar and loading up the cars. And, you know, it stopped really just as they're about to head towards the location. And there's no, you may say paused. Again, I would say they were hopeful to find that it might be easier than they thought it might be. But there was no indication of a decision not to go forward. And, in fact, the indication, again, purchasing items, loading up the cars, the crowbar was found in one of the cars. They didn't just buy it and leave it behind when they decided that somebody might be there. They put it in the car and were ready to go. I've forgotten. Did they ever go through with the idea of buying masks, procuring masks? There was a mask in one of the cars. So that was another indication that they were concerned. And, Your Honor, I appreciate you raising that, because that's another bit of information suggested that being seen was of concern, which wouldn't be a concern if they thought they were buying an empty house. It's also a possibility. But I think, you know, again, reasonable inference that steps were taken to prepare for an entry where somebody might be present. And despite efforts to, again, determine if it might be a little easier job than they had prepared for, they were going to go forward in either way. And I think that distinguishes it from ACOSTA and answers that question. One other point, just to raise because of some discussion of the question of prejudice. And the court can read the record itself, and I won't go on at length, but I think the fair reading of the record is that there were numerous references by the defendant to the question of whether anybody was present. And in the opening, his first argument was that the essential point that the jury had to consider was whether there was an agreement to enter when someone was present. And, yes, there were references to Wilson. Understandably, he was the most likely person to be present. And his absence would undermine the suggestion that they were prepared to enter if someone was present. But nonetheless, in both the questioning openings and closings, the question was presented that the key point was whether anyone was present. And I think that undermines the idea that the only reasonable reading of the indictment was that it was predicated only on Wilson. Otherwise, those arguments would not have been necessary, but in fact appear to be responsive directly to the theory of the case the government actually pursued. Are there no further questions? Thank you, Your Honor. Thank you very much. Let me pick up right where you left off. The argument, Judge Rookman, that you were talking about, what was the evidence that they thought someone was there? That's the case that wasn't tried. There was evidence. The reason we didn't raise it on appeal as a sufficiency issue is that there were shreds of that. There was this sound emanating from the house and the mask. So on a sufficiency argument, I'm in trouble. And so that's why it wasn't raised. But again, the opening statement, certainly there was a broad reference that someone else has to be there. But then it says, the supposed target of the robbery, Joseph Wilson, was away. He was away on a snowboarding trip. And then a reference to the Internet posting. The cross-examination of Special Agent Ventitullo specifically asked about an individual who lived there, who was selling glass artwork, and that nothing on the call says whether or not that person is going to be home, does it? That's at app 205. There's specific questioning. And we didn't go into what the music was heard, because there was already evidence that someone was there. The question is, was Mr. Wilson there? And that's what the indictment says. I do want to address one other point earlier, Judge Howard, in the argument about whether Sterone is a variance case or not. I would suggest that the Court's decision in De Leon de la Rosa also applies here and shows that it's a constructive amendment. That case, I recognize it references and incorporates, that statute incorporates Section 881. But the offense was under Title 46. It's a Title 46 offense. And the analog here is just as all 881 does, it provides the definition of what is forfeitable property. And the government elected in its indictment to charge one version of that. That matches up with this case where there's one type, if I may finish, where there's the offense is a robbery, a conspiracy to commit a robbery, and then the definition of robbery talks about different types of robbery. And the case also identifies different types of robbery. So I would suggest that this is a constructive amendment case. I do agree with counsel that this Court's opinion sort of suggests that there's a continuum. I don't know where this case falls in it. It's my position, obviously, that I believe it's a constructive amendment. It simply says, person number one. But even if it's a mere variance, the prejudice here was enormous at trial. And so I'll leave it at that.